United States District Court
Southern District of Texas
**ENTERED**
April 07, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DAVID BROWN, as next friend for minor child T.B. and minor child R.B., | § § § § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. 4:24-cv-4895 |
| SPLENDORA INDEPENDENT SCHOOL DISTRICT, *et al.,* | § § § § | |
| *Defendants.* | § § | |

## ORDER

This Court has already addressed some of the facts in this case in prior Orders, but to give some context to this Order, the Court necessarily repeats the pertinent allegations, albeit not in the same detail that Plaintiff's 123-page Amended Complaint does. (Doc. No. 53). Next friend David Brown has two sons, TB and RB, who either are attending or have attended school in the Splendora Independent School District ("ISD").[1] This case arises from the school's various attempts to either investigate or to discipline both boys for behavior infractions. The Court will detail the contentions as to each child separately.

### I.　BACKGROUND

#### A.　TB

TB was only involved in one incident that is included as a basis for liability in this lawsuit. On October 17, 2024, he was suspended for not surrendering his cell phone during the Preliminary Scholastic Assessment Test ("PSAT"). He received a one day out-of-school suspension ("OSS"). His original punishment was one day of in-school suspension ("ISS"), but it was converted to an

---

[1] The Court recognizes Brown's status as next friend for his children, and that in the latter half of the Amended Complaint he makes certain claims on his own behalf, but for ease of comprehension, the Court refers to Plaintiffs in the singular ("Brown" or "Plaintiff") throughout this Order.

OSS when he continued to use his phone contrary to directions while in ISS. (Doc. No. 53 at 25). In his Amended Complaint, TB admits refusing to surrender the phone during the administration of the PSAT when requested to by the individual (Bay Hill) who was proctoring the test. (*Id.*).

Based upon this single incident, Plaintiff is seeking a variety of forms of relief (including substantial money damages) based upon claims of alleged:

1.  Violations of Fourteenth Amendment liberty and property;[2]

2.  Violations of Fourteenth Amendment due process and various state law claims.

### B.  RB

RB's contentions involve multiple incidents and ultimately contain over 50 of what Plaintiff titles as "claims." RB's first claim is that he was punished for being tardy on October 24, 2024. He received ISS. He claims:

3.  Violations of the Texas Education Code § 37.005(a);

4.  Violation of Professional Ethical Conduct, Practices, and Performance (Standard 1.1);

5.  Denial of Due Process because David Brown was not notified of the ISS on or before the day it was issued and served;

6.  Violations of the Texas Education Code § 37.0012(d);

7.  Violations of the Splendora ISD policy requiring prompt notification of disciplinary action;

8.  Denial of due process and redress of grievances because Plaintiff's right to petition the Government for redress was abridged; and

---

[2] The Court hereinafter numbers each claim in this Order to the corresponding numbered claim in Plaintiff's Amended Complaint.

9.  Violations of the Texas Education Code § 26A.001(a) and Splendora ISD Board Policy.[3]

On or about November 21, 2024, there was an altercation on a school bus, and RB was in a physical altercation with another student. The next day, he was initially given the standard 3-day OSS for fighting. However, later in the day, after having an opportunity to review the bus's video tape, RB's original punishment was rescinded as the tape apparently indicated RB was not at fault. Based upon this incident, Plaintiff alleges:

10. Illegal suspension without due process;

11. Failure to consider self defense in the suspension decision;

12. Conspiracy to deny liberty and property interests; and

13. Falsification and maintenance of inaccurate school records—in that Plaintiff claims the school records do not accurately describe RB's exoneration.

During the next month, on December 5, 2024, a group of students including RB were taken to the principal's office by a school resource officer. There was an apparent smell of marijuana in a restroom, and there were students in the vicinity, including RB. An investigation was carried out, and RB was exonerated. During the investigation, the principal took possession of the students' cell phones. Plaintiff makes the following claims related to that incident:

14. Illegal seizure without individualized reasonable suspicion;

15. Violation of school policy on cell phones and denial of rights;

16. Illegal search without individualized reasonable suspicion; and

17. Release of Personal Health Information ("PHI") to government officials without authorization.

---

[3] The actual Amended Complaint has two claim number 9s. (Doc. No. 53 at 48). The Court combines them here rather than re-number the entirety of the claims.

Next, on January 16, 2025, a teacher requested/demanded that all students put their cell phones in a blue pouch that was attached to the classroom's wall and designed for that purpose. RB declined and was sent to the principal's office. The Vice Principal called RB's father (Plaintiff) and issued a 1.5-day ISS for noncompliance. Brown on RB's behalf claims this violated the Student Code of Conduct. Ultimately, he claims Splendora ISD cannot regulate cell phone usage on its campus. Due to this incident, Plaintiff makes the following claims:

18. Illegal suspension without due process;

19. Conspiracy to deny educational rights;

20. Violation of the Student Code of Conduct;

21. Violation of the Texas Education Code § 37.009;

22. Denial of due process;

23. Illegal suspension without due process;

24. Failure to investigate and conspiracy to deny fair procedure;

25. Discrimination based upon gender;

26. Violation of Texas Education Code § 37.009 and School Board Policy;

27. Denial of statutory due process; and

28. *Monell* claim for pattern of due process denials.

On March 21, 2025, RB was again placed in ISS: this time for being tardy. He claims that he was not tardy for one class because he had been transferred to another class. Nevertheless, it was clear he was not in someone's class on a timely basis. Plaintiff once again complains that he should have been immediately called, and some form of hearing should have been held. With regard to this incident, he claims the following:

29. Illegal suspension;

30. Denial of due process;

31. Failure to notify parent of ISS per Texas Education Code § 37.0012(d) and School Board Policy;

32. Violation of Texas Education Code §§ 37.005(b)(2), (e);

33. *Monell* claim for pattern of statutory violations.

Plaintiff's final contentions center on RB's grades. He claims that in retaliation for the January 16, 2025 cell phone incident, the teacher involved retaliated against RB by giving him bad grades from November 15, 2024 through February 2025. (He does not explain how his bad grades in November and December of 2024 and in early January could be in retaliation for conduct that did not happen until mid-January). While his Amended Complaint is somewhat scattershot, it is clear Brown is complaining about the grades RB was given. More specifically, he complains that the homework RB turned in late (for which he was only given 50% credit) should have been given much higher scores. In support, Brown's Amended Complaint quotes the Splendora ISD grading guidelines to say that late work can have a maximum penalty of 85%. (Doc. No. 53 at 81). If so, the teacher here only assessed a 50% penalty—well within the guidelines. Despite that, Plaintiff brings "causes of action" under the following headings:

34. False and retaliatory grading practices;

35. Violation of the Splendora ISD Student Handbook (Page 65);

36. Violation of the Splendora ISD Student Handbook (Late Work Policy);

37. Violation of the Splendora ISD Board Policy; and

38. Delays in grading and retaliation.

Brown then detailed various attempts—some successful, some not—in which he tried on RB's behalf to pursue a grievance against the teacher in question. A Level One meeting was held

5

according to Brown, but it was abruptly terminated due to his allegations of retaliation. He claims the following due to that meeting:

39. Denial of due process;

40. Violation of First Amendment (protected speech and the right to redress grievances); and

41. Conspiracy to deny constitutional rights.

Following this abbreviated conference, no conclusory report or response was issued. Brown claims this lack of resolution prevented him from raising the grievance to a Level Two. He claims this delay led to the following violations:

42. Denial of grievance process;

43. Fundamentally unfair conference; and

44. Falsification of government records as common practice.

Plaintiff then filed another grievance with the school district due to the termination of the grievance hearing in which he demanded an investigation. He apparently never received a response. He now makes a claim that these actions or inactions violated:

45. Splendora ISD's policies (grievance process); and

46. David Brown's constitutional right to free speech.

The claimed inaction by the Board is undercut by Brown's very next claim. He contends that immediately after the March 4, 2025 meeting was cut short, he filed a letter demanding an investigation. He filed that with Dianna Archer—the designated grievance coordinator. The very next day, she emailed him back telling him she would investigate his complaints for Splendora ISD. Brown, instead of being satisfied that the grievance coordinator was on the job, complained that she was investigating his complaint as another Level One complaint instead of a Level Two.

6

Archer later issued a report that Brown disagrees with, and he complains that it took her 10 days too long to complete the report. Brown labels this conduct as:

47. A denial of the proper grievance level and due process;

48. A provision of a false, fraudulent, and untimely written report;

49. A violation of grading policy and failure to provide evidence; and

50. A failure to provide educational materials during suspensions.

Eventually Brown filed what he describes as a separate Level Two grievance with the Superintendent of the school district. He claims that this was summarily denied. Brown claims the Defendants are liable for this denial under the following theories:

51. Denial of Level Two grievance;

52. Willful and malicious violation of statutory and constitutional law; and

53. Conspiracy to ignore rights.

Finally, Brown requested a Level Three hearing before the entire Board of Trustees. He apparently received no response to this request. He claims damage because this lack of response violated:

54. Splendora ISD's Board Policy;

55. Texas Education Code § 28.0214 and Board Policy;

56. His First Amendment right to redress grievances;

57. Texas Constitution Article I, Section 27 (Right to Petition for Redress of Grievances); and

58. Texas Constitution Article I, Section 19 (Due Course of Law).

On R.B.'s behalf, Plaintiff seeks over five million dollars in damages, public admonishments and sanctions, the appointment of a special master, and whatever additional relief

7

this Court finds to be just. Brown also seeks damages for himself based upon what he considers denials of his rights to pursue a grievance.

## II.    LEGAL STANDARDS

In response to the voluminous Amended Complaint, the Individual Defendants have filed a Motion to Dismiss (Doc. No. 56) focused primarily on their claim of qualified immunity and the fact that the claims against them are the same claims made against Splendora ISD. Since the claims emanate from the same facts, they claim they cannot be held liable in their official capacities. Splendora ISD, on its behalf and on behalf of the individual defendants in their official capacities, also filed a Motion to Dismiss (Doc. No. 55). Plaintiff has responded in opposition to these motions, (Doc. Nos. 60, 61), and the Defendants have replied, (Doc. Nos. 64, 65).

The motions to dismiss, perhaps due to the manner in which the Amended Complaint is organized, are somewhat given to attack the various categories of contentions as opposed to focusing on each individual claim on a claim-by-claim basis. The Court will address Plaintiff's claims in the same categorical fashion. If it had to describe the Defendants' more substantive attacks using Rule 12 as a guideline, the Court would say they fall almost solely into the 12(c) category, seeking judgment on the pleadings. Secondarily, Defendants' arguments fall under Rule 12(b)(6)—the failure to state a claim upon which relief can be granted. Albeit courts use almost the same analysis under 12(c) as they do under Rule 12(b)(6), the Court sets out the guiding principles involved in each category below.

### A. Rule 12(c) Motion for Judgment on the Pleadings and Rule 12(b)(6) Failure to State a Claim

A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Gentilello v. Rege*, 627 F.3d 540, 544-545 (5th Cir. 2010). A defendant may file a motion to dismiss a complaint for "failure to state a claim upon

8

which relief may be granted." Fed. R. Civ. P. 12(b)(6). Similarly, a plaintiff may file a Rule 12(b)(6) motion to dismiss a counterclaim. *See Kansas v. Nebraska*, 527 U.S. 1020 (1999). To defeat a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept factual assumptions or legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

### B. Only Facts Are Accepted as True

The Court should note that Brown appears *pro se*—which is why this Court has given him a chance to replead this case in a fashion compliant with the Federal Rules. It is clear from his live Amended Complaint that he has taken some effort to familiarize himself with the various pertinent rules, but the Court must emphasize one rule mentioned above that based upon the pertinent

9

pleadings may be misunderstood. While in a motion to dismiss context, whether it be under Rule 12(c) or Rule 12(b)(6), a court must accept all well-pleaded facts as true. It does not have to accept contentions, conclusions, or speculation as true. The pleadings in question contain all three, sometimes by themselves or in combination—sometimes intermingled with appropriate factual allegations. Those factual pleadings are hereby given the credit they are due, but the remaining arguments or allegations that are embedded with contentions, conclusions, and speculation, are not considered factual allegations. *See Iqbal*, 556 U.S. at 678–79 (the court is not bound to accept factual assumptions or legal conclusions as true).

### III.    ANALYSIS

#### A. Cell Phones in Class

All of TB's claims and over ten of RB's claims center around the possession of cell phones in the classroom. While Splendora ISD allows students to carry cell phones in school for "safety purposes," they are not to be used during testing. (Doc. No. 51 at 18). Additionally, teachers are empowered to collect phones so that they do not disrupt class. (*Id.*). More importantly, students are instructed that they "shall not: [f]ail to comply with directives given by school personnel." (*Id.* at 14).

According to the Amended Complaint, TB refused to surrender his cell phone to school personnel prior to taking the PSAT test (Doc. No. 53 at 24), and RB refused to surrender his phone to be placed (along with all his other classmates' phones) in a blue pouch during the pendency of a teacher's class. (*Id.* at 58). Consequently, according to Plaintiff's own pleadings, both RB and TB refused to follow the directives of those in authority.

Their pertinent pleadings are set out below.

10

**18.2** On October 17, 2024, school employees demanded TB surrender his cell phone to participate in the PSAT or ASVAB test, and upon his refusal, Principal Allen Painter and/or Bay Hill imposed a one-day out-of-school suspension.

**28.3** On or [a]bout January 16, 2025, Teacher Bo Grubbs directed all students in his class, including RB, to surrender their personal cell phones by placing them into a blue pouch affixed to the classroom wall.

(Doc. No. 53 at 25, 58).

Relying on the general language found in the Splendora ISD Student Code of Conduct stating that the school will allow students to possess personal cell phones, Plaintiff argues that the right to possess a cell phone is a sacrosanct right that supersedes all other provisions of the Code or other directives of an instructor.

Brown's reading of the handbook is very selective. He relies only on the portion that supports his lawsuit while ignoring the remaining portions that undercut the claims. Specifically, the Code of Conduct states:

**Possession of Telecommunications or Other Electronic Devices (Including but not limited to smart watches and air pods).**
For safety purposes, the district permits students to possess personal cell phones; however, these devices must remain turned off or on silent during the instructional day, including during all testing, unless they are being used for approved instructional purposes.

*Without such permission, teachers will collect the items and turn them into the principal's office.* The principal will determine whether to return items to students at the end of the day or to contact parents to pick up the items.

(Doc. No. 51 at 18) (emphasis added).

Clearly, as pleaded, neither TB nor RB had permission to possess the phones at the times in question, and without that permission, their teacher was authorized to collect the phones. Additionally, their failure to follow the teachers' directives constituted additional problems. (Doc. No. 53 at 14). RB then continued to compound the problem when he failed to surrender his phone or to report as directed to ISS. (*Id.* at 58).

11

There is no constitutional right to possess a cell phone in class. Furthermore, to temporarily deprive a student of his cell phone during a class or a test and return it to them after the class or test is completed (or even at the conclusion of the school day) is not a constitutional violation. Both TB and RB directly refused to follow the directive of a teacher. TB received a one day out-of-school suspension. He appealed this suspension to the principal. RB received initially a 1.5 day in-school suspension. The punishment was escalated to OSS when he refused to turn over the phone during the ISS. An ISS does not implicate due process concerns. *See Esparza v. Bd. of Trs.*, 182 F.3d 915, at *4 (5th Cir. 1999) (holding "in-school suspension [for ten days] does not constitute an unconstitutional deprivation of a property right"); *Trice v. Pearland Indep. Sch. Dist.*, No. 3:19-CV-00286, 2020 WL 1557750, at *7–8 (S.D. Tex. Mar. 16, 2020) (finding "the mere threat of an in-school suspension does not constitute an unconstitutional deprivation of a liberty or property right"), *report and recommendation adopted*, 2020 WL 1667748 (S.D. Tex. Apr. 1, 2020). Furthermore, both students were given an opportunity to comply, and both chose not to comply.

> There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

*Goss v. Lopez*, 419 U.S. 565, 582 (1975).

In TB's case, he pursued an appeal, (Doc. No. 53 at 25–26), and in RB's case, the Principal and RB's father discussed the situation prior to the ISS being upgraded to OSS. Accordingly, the suspension for not following directives was neither a violation of the Fourteenth Amendment nor of the Code of Conduct.

The Court now turns to Brown's intertwined state law claims based upon the same fact situation. He asserts that the school violated Sections 26A.001(e)(2), 26A.001(e)(9), and

12

26A.001(e)(11)(b) of the Texas Education Code. This Chapter did not come into existence until it was added by the 2025 Texas Legislature and therefore cannot be a basis for liability with respect to RB. Brown makes the additional charge that § 37.009(a) of the Texas Education Code was violated. That section is only implicated if a student is removed by a teacher for unruly or disruptive behavior or placed in a disciplinary alternative education program—neither of which apply to the cell phone issue.

The Court finds that neither RB nor TB have any legally cognizable claim regarding their respective cell phone scenarios. That being the case, TB's claims (Claims 1 and 2) are **DISMISSED**. Additionally, Claims 18, 19, 20, 21, 22, 26 (to the extent it makes a claim under § 37.009), and 27 (RB's claims related to the cell phone incident) are **DISMISSED**.

### B. Disciplinary Action Against RB for Tardiness[4]

RB pleads that he was given a one-day ISS for being tardy in late October of 2024. He also complains of a later incident where he was cited for being tardy (March 21, 2025)—which also resulted in a one-day ISS. Brown contends that the Student Code of Conduct does not list "tardiness" as a suspendable offense and further claims that the term "tardy" is not even mentioned. The Court will point out that the Code of Conduct states:

**Standards for Student Conduct**

Each student is expected to:

\*\*\*

- Attend all classes regularly *and on time*.

(Doc. No. 51 at 12) (emphasis added).

---

[4] In this incident, Plaintiff's Complaint has embedded in it a side issue in which he contends that there was some ulterior claim of sexually harassing comments made against RB; however, he goes on to say that there are no reports or documents concerning such alleged comments. Plaintiff concedes that RB was only punished in the October incident for being tardy, so this need not be addressed.

13

Moreover, the Splendora ISD Student Handbook has an entire page on tardiness that reads as follows.

**Splendora ISD Student Handbook**

**Tardies (All Grade Levels)**
*A student who arrives after the start time of class is considered tardy and may be assigned to detention hall or given another appropriate consequence.*

**SISD Tardy Guidelines**

It is very important that students proceed to class in a timely manner. In order to prompt student attendance, the following guidelines will be used regarding campus tardy policies.

Campus tardy policies will adhere to the following guidelines:

1. Tardy policies will be reviewed with parents, teachers and students at the beginning of the year and again at the beginning of a semester.

2. Tardy policies will be included in the campus handbooks and posted clearly for students, parents and staff members to see.

3. At the principal's discretion, "Tardy Sweeps" will be announced. At that time, *any student who is tardy will be assigned to detention regardless of how many tardies have been accumulated.*

4. Students will not be suspended (*out of school suspension*) for tardiness or truancy. Tardy counts start over every 3 weeks.

5. The campus tardy plan will include all staff responsibilities for monitoring students during passing periods. Areas to monitor will include: restrooms, gymnasiums, hallways, classrooms and all common areas.

6. Teachers should not "hold over" any students from a previous class period or allow them to be late without issuing a written permit. All staff members will be involved in encouraging students to get to class on time.

7. Campus administration will monitor tardiness weekly. Consequences will be issued for excessive tardiness. All students with excessive tardiness will be subject to disciplinary action.

8. All student tardiness will be documented.

9. For elementary students, a parent or guardian must sign in with the front/attendance if their student arrives at school after 8:30 AM.

14

> Campus administration will use discretion on a case-by-case basis for the need to excuse tardiness and assign consequences. Administrators may choose from each level a consequence to issue for tardiness.

(Doc. No. 51 at 167) (emphasis added).

Clearly not only has the school district emphasized the need for being in class in a timely fashion, but it has also set out that those who are not punctual will be penalized. The two ISSs RB received for being late are sanctioned by both the Code of Conduct and the Handbook.

Plaintiff claims damages for these two ISSs (related to RB's tardiness) because he claims that § 37.005(a) was violated, § 37.0012 was violated, and that damages are also due under the Texas Penal Code § 37.10(a)(1). First, there is no private cause of action under the Texas Penal Code. *Joyner v. DeFriend*, 255 S.W.3d 281, 283 (Tex. App.—Waco 2008, no pet.) (citing *Trevino v. Ortega*, 969 S.W.2d 950, 953 (Tex. 1998)); *see also Kiggundu v. Mortgage Elec. Registration Sys.*, Inc., No. 4:11-1068, 2011 WL 2606359, at *6 n.79 (S.D. Tex. June 30, 2011) (holding claim under Texas Penal Code failed as a matter of law because the Texas Penal Code does not create a private right of action), *aff'd*, 469 F. App'x 330 (5th Cir. 2012).

Secondly, § 37.0012 of the Texas Education Code requires schools to designate a Campus Behavior Coordinator. Subsection (d) requires that coordinator to inform a parent/guardian if their child is placed in either ISS or OSS. Brown's complaint is that he did not receive a "prior contemporaneous notice of RB's ISS . . . ." This statute does not require prior or contemporaneous notice. It only requires prompt notice. Tex. Educ. Code § 37.0012(d). Even notice mailed the day after the implementation is considered prompt. *Id.* § 37.0012(e). Brown admits he learned of the ISS during the course of the school day in which RB was serving the suspension. (Doc. No. 53 at 42). This complies with the statute. Since this statute permits a mailed notice the day after the ISS, a phone notice on the same day has to be timely. With respect to the March 2025 event, Brown

15

concedes in two different places that a meeting regarding this ISS was held in the school hallway. (Doc. No. 53 at 74, 77). This Court finds that the notification was sufficient to satisfy the requirements of Chapter 37. Being placed in ISS for being tardy is not illegal; it did not violate due process. Furthermore, it did not violate Sections 37.005(b)(2) and (e) as Brown suggests because neither suspension exceeded three days.

Finally, to the extent Brown is alleging a variety of due process/constitutional claims, it must be pointed out that to pursue a procedural or substantive constitutional claim one must have been deprived of a constitutionally protected liberty interest. *The Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972). An ISS does not deprive one of property or liberty interest. *See Esparza*, 182 F.3d at *4; *Nevares v. San Marcos Consol. Indep. Sch. Dist.*, 111 F.3d 25, 26 (5th Cir. 1997). The Court, therefore, **DISMISSES** Claims 3, 4, 5, 6, 7, 8, 9 (both claims numbered 9), 29, 30, and 31.

### C. The Alleged Marijuana Incident

On or about December 5, 2024, a few students, including RB, were taken to the office by a school resource officer who had smelled marijuana in the restroom and found those students were close in vicinity to that smell. Once in the office, the Assistant Principal took possession of the students' cell phones. Additionally, he searched their persons for marijuana, and the school nurse did an examination to determine if any of the students had objective signs that they had been smoking marijuana. After that process, the school staff concluded that RB was not involved. His phone was returned, and he was not suspended or punished in any manner. Nevertheless, Brown claims that the school conducted an illegal seizure of RB's person and his cell phone, an illegal search without reasonable suspicion, and that the school officials released personal health information to government officials.

16

The Supreme Court has long recognized that for Fourth Amendment purposes, schools occupy a unique position. The "substantial need of teachers and administrators for freedom to maintain order in the schools" demands that they be given the flexibility to act with swift and informal investigative and disciplinary procedures. *New Jersey v. T.L.O.*, 469 U.S. 325, 340–41 (1985). In doing so, the Supreme Court adopted a two-tier test. First, the search must be prompted by suspected wrongdoing. Second, the search must be reasonably related to the circumstance that justified its inception. A search will be acceptable if there were reasonable grounds to suspect the student of possessing contraband and the measures adopted were reasonably related to the objectives. *Id.* at 341–42. Many courts have held that marijuana use on school property satisfies the need to investigate further. That investigation can be aimed at an individual or a group of students (without individual reasonable suspicion) if the circumstances suggest that course of action. *Stanford v. Northmont City Sch. Dist.*, No. 23-3203, 2023 WL 6389624, at *2–3 (6th Cir. Oct. 2, 2023). The Eleventh Circuit has echoed this sentiment. *See United States v. Roberts*, 849 F. App'x 863, 866–67 (11th Cir. 2021). The fact that RB and others were "detained" during the investigation of the incident because they were in the area of the marijuana smell does not give rise to a constitutional claim.

Due to their location and the location of the marijuana smell, it was reasonable to escort the entire group of students, including RB, to the office to conduct the investigation. The nurse's role consisted of performing a medical assessment for substance abuse by looking at one's eyes, speech, and vital signs. There is no proof that any invasive tests were conducted or that any bodily fluids were collected. (Doc. No. 55-1).[5] Courts have long held that these kinds of assessments as

---

[5] The Fifth Circuit has held that in the Motion to Dismiss context, courts may consider exhibits attached to the motion if they are central to an issue raised by the complaint. *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000). Thus, this Court may consider the nurse's assessment on RB.

an investigative tool are not unreasonable. *Bridgman ex rel. Bridgman v. New Trier High Sch. Dist. No. 203*, 128 F.3d 1146, 1149–50 (7th Cir. 1997). While Brown speculates that these results were "released" improperly to government officials, the allegation is totally unsupported by any actual pleaded facts.

The Court should add that even according to the Plaintiff's contentions, RB was quickly exonerated. The Court, therefore, **DISMISSES** Claims 14, 15, 16, and 17.

### D.  The Bus Incident

As described by the Amended Complaint, RB was attacked on the school bus on or about November 21, 2024. A fight ensued as RB sought to defend himself. The next day, RB was issued a three-day OSS; however, later that day, after an opportunity to review the incident (including the bus video), that suspension was rescinded.[6] Brown brings claims this suspension was "illegal" and that the school failed to consider RB's self-defense in the suspension decision. Nevertheless, Brown claims that the Assistant Principal who called him, informed him "that the suspension had been lifted upon review of the bus video, which substantiated RB's self-defense claim." (Doc. No. 53 at 49). Consequently, it is beyond dispute that the school took RB's self-defense claim seriously, as they found it to be true.

The Supreme Court, as noted above, has articulated the due process standard for OSS of 10 days or less.

> [D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him, and if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.
>
> \*\*\*

---

[6] Brown claims at one point in the Amended Complaint that RB was never given a chance to oppose the suspension. Yet, in another part he says RB was given an opportunity to present a written statement in which he detailed his role in the incident as self-defense.

> There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

*Goss*, 419 U.S. at 581–82.

The Court continued,

> We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspension must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident.

*Id.* at 583.

Furthermore, the Fifth Circuit has resolutely rejected "any suggestion that the technicalities of criminal procedure ought to be transported into school suspension cases." *Brewer ex rel. Dreyfus v. Austin Indep. Sch. Dist.*, 779 F.2d 260, 263 (5th Cir. 1985).

Accordingly, Plaintiff's Claims 10, 11, and 12 are hereby **DISMISSED**.

### E.  The Classroom Disruption Dispute

"On or about March 12, 2025, *during a class testing period*, Teacher [Name Not Specified in Allegations] removed RB from the classroom and referred him for suspension." (Doc. No. 53 at 65) (emphasis added). The reason he was removed, as specified in Plaintiff's Amended Complaint, was that RB refused to sit in his assigned seat, was being difficult, and was talking across the room while others were taking the test. RB claimed at the time that he perceived his being sent to the office to be "racial injustice." To make matters worse, RB then called the teacher a "racist." Brown admits in his Amended Complaint that RB was mistaken in this notion. (*Id.*).

Brown claims that refusal to sit in one's assigned seat, being difficult, and talking during a test is not enumerated in the Student Code of Conduct and therefore cannot be the basis for

discipline. To reach this conclusion, Brown again employs a very selective reading of the Code of Conduct. The Code of Conduct requires students to demonstrate courtesy. (Doc. No. 51 at 12). Talking across the classroom, being difficult, and calling the teacher a "racist" while others are trying to take a test certainly violates that tenant. The Code also requires one to respect the rights of other students and teachers. Again, that conduct violates this provision. Failing to sit where assigned and failing to be quiet during tests certainly qualifies as a failure to follow directives as given by school personnel—yet another violation. (*Id.* at 14). Clearly RB's conduct was disruptive. That is specifically addressed and prohibited in the Code of Conduct. (*Id.* at 16). The conduct Brown admits happened clearly violates numerous Code of Conduct provisions.[7] He also admits that he pulled out his phone during the test, (Doc. No. 53 at 66), another violation of the no phones during testing provision. RB was given a written suspension notice, (*Id.* at 65), and allowed to present his own written version of the incident, (*Id.*).

He now claims, despite admitting to his own misconduct, that he was suspended without due process, that there was a failure to investigate, a conspiracy to deny fairness, and that he was discriminated against because of gender. The first claims are easily disposed of because RB was clearly given a chance to respond to the allegations. He even obtained another student's statement to help his defense. Moreover, he admitted there, and admits in his Amended Complaint, his acts of misconduct. Therefore, Claims 23 and 24 are **DISMISSED**.

The new claim of gender discrimination is one that RB apparently came to after some reflection. He claims that at least one other female student was being disruptive and talking on the phone, yet she was not punished as he was.

---

[7] RB apparently does not deny this misconduct. In the Amended Complaint, his main contention seems to be that others, including a female, were also misbehaving but were not punished.

It is well established that "§ 1983 suits based on the Equal Protection Clause are available to plaintiffs alleging unconstitutional gender discrimination in schools." *Ruvalcaba v. Angleton Indep. Sch. Dist.*, No. 20-40491, 2022 WL 340592, at *3 (5th Cir. Feb. 4, 2022) (quoting *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (internal quotations omitted)). However, a school district cannot be held liable under § 1983 under a theory of vicarious liability or *respondeat superior*. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001). Brown must allege that the school district's policy, practice, or custom constitutes a deprivation of Plaintiff's equal protection rights. *Id.* at 579. Plaintiff fails to allege facts suggesting a policy, practice, or custom of the like. Furthermore, the fact that one student was punished for misbehaving, but another of a different gender was not, is not sufficient to allege a claim of gender discrimination. *See Clayton ex rel. Hamilton v. Tate Cnty. Sch. Dist.*, 560 F. App'x 293, 298 (5th Cir. 2014). Accordingly, he fails to state a claim for any gender discrimination, so Claim 25 is **DISMISSED**.

### F.  The Grading Complaints

Brown alleges that from November 15, 2024, to January 17, 2025, teacher Bo Grubbs gave RB only 50% credit for work that Plaintiff claims merited higher scores. Apparently, Brown later raised this issue and was told by Grubbs that the assignments were turned in late. Brown complains that the low grades were given in retaliation for RB's refusal to turn in his cell phone on January 16, 2025.[8] He claims that Splendora ISD is guilty of false and retaliatory grading practices, violating page 65 of the Splendora ISD Student Handbook, violating the Student Handbook's late work policy, violating the School Board grading policy, and delays in issuing grades for RB.

First, the Court finds that the grades given to a student in high school, regardless of their accuracy, do not serve as a basis for a federal cause of action. *See A.V. v. Plano Indep. Sch. Dist.*,

---

[8] Brown does not articulate how RB's poor grades in November, December, and early January could be in retaliation for an incident that had not yet occurred.

585 F. Supp. 3d 881, 894 (E.D. Tex. 2022) (finding injury to scholastic record, standing alone, could not prevail as a protected interest entitled to due process); *Harris ex rel. RNH v. Adams*, 757 F. Supp. 3d 111, 131 (D. Mass. 2024) (finding no case law suggesting the existence of a constitutional right to receive a certain grade on an assignment). Moreover, Brown filed a grievance about RB's grades that progressed arguably to the second grievance level—so it is clear that RB was afforded due process.

Brown also claims a violation of page 65 of the Student Handbook. While this Court does not necessarily find a violation of the Student Handbook by a teacher or the administration to set out a cognizable cause of action, it nonetheless quotes that page in its entirety because its language demonstrates that Plaintiff's assertions are incorrect.

### Splendora ISD Student Handbook

- Reassessment opportunities may be denied if a student has any missing assignments that are deemed essential for their comprehension of the assessed content or skills
- *A maximum grade of 80% can be earned.*

#### Assessment Guidelines
All teaching staff are required to follow the guidelines outlined in the District Assessment Calendar. Modifications to the assessment procedures are only permitted if properly documented. Diagnostic assessments will not be counted for a grade.

#### Skyward Grading Scale
Skyward is set up so that daily grades are weighted 40% and test grades are weighted 60%. Grades should be a reflection of the students' learning journey.

#### Major Grade Assignments
Major assignments refer to complex tasks or assessments that generally take one to five days to complete. Students must receive advance notice of any activity or test that constitutes a major grade. Additionally, students will be informed of content covered on all assessments. Each grading period will include a minimum of three major grades, providing a balanced assessment of student performance. Teachers are responsible for returning and reviewing major assignments with students within a timely manner. Major grade assignments may include:
- SBAs

22

- Projects
- Oral Reports/Presentations
- Final Essays/Compositions
- Research Papers
- End of Unit Assessments

### Minor Grade Assignments

Minor assignments in Splendora Independent School District (ISD) include classwork, quizzes, and homework that typically require less than three days to complete. It is expected that teachers return and review these minor assignments with students in a timely manner, ensuring prompt feedback and an opportunity for students to learn from their work. Teachers are required to have a minimum of 10 minor assignments within each grading period, promoting regular assessment and engagement in the learning process.

(Doc. No. 51 at 123) (emphasis added).

There is nothing on this page of the Student Handbook that prevents a teacher from assessing a 50% deduction for late work. Brown contends that:

**34.7** Under Splendora ISD's official grading guidelines, late work must be accepted within a three-week timeframe from the original due date (provided it falls within the nine-week grading period), with a maximum grade penalty of up to 85%. Grubbs's assignment of 50%—far below the maximum late penalty—deviated from this policy without rationale.

(Doc. No. 53 at 81).

First, a 50% grade penalty certainly falls within the parameter of up to an 85% penalty. Secondly, the Handbook to which the Court was directed states the maximum grade for late work will be an 80. Regardless of whether the maximum grade available is an 80 or the maximum grade penalty available is up to 85%, Grubbs' assignment of a grade of 50% complies. Brown also complains of periods of time when Grubbs either did not post grades or posted them in a dilatory fashion according to policies of Splendora ISD. This claim, even if true, does not state a private cause of action.

23

Finally, Plaintiff's grading complaints are all based upon a claim of retaliation. To state a claim for retaliation, Plaintiff must prove (or in the circumstances of a motion to dismiss at least plead specific facts) that:

(1) RB was involved in a constitutionally protected activity;

(2) That the Defendants caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and

(3) That the Defendants' activities were substantially motived against the exercise of the constitutional right.

*Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

Here, as pleaded, there was no constitutionally protected activity that RB was engaged in that led to the alleged retaliation. Setting aside the fact that the assignments were late, according to the pleading, the low grades were levied in retaliation for RB's refusal to place his phone in the classroom's blue pouch so class could begin. As noted, having a phone during a high school class is not a constitutionally protected activity. Finally, other than conclusory contentions, Brown has not pleaded any facts that would indicate that the teacher's actions in question were substantially motivated by the phone incident. Finally, as noted earlier, Brown claims the grading problem began in November of 2024, and the phone incident did not occur until two months later, which renders any cause-and-effect relationship almost impossible—and certainly not one that is substantially motivated as required by law.

The Court hereby **DISMISSES** Claims 34, 35, 36, 37, and 38.

### G. The Grievance Contentions

Brown claims he first brought this alleged grading problem to the teacher's attention by email. He then filed a Level One grievance on February 28, 2025. A Level One grievance hearing

24

was held on March 4, 2025. According to the Amended Complaint, this hearing was cut short when Brown accused Grubbs of acting in a punitive fashion motivated by retaliation. After Brown made these accusations, the principal terminated the meeting. Brown followed up this termination by email. He also filed a new grievance about the terminated grievance hearing.

The next day, in response, Dianna Archer, the school's grievance coordinator, contacted Brown and told him that she would take over the Level One campus behavior process and investigate the claim. Brown objected to this solution and insisted he should be able to proceed directly to a Level Two hearing. She eventually issued a report that Brown contends is filled with errors and omissions and issued in an untimely fashion.

On March 3, prior to both the March 4 Level One hearing that was terminated and the report by Archer, Brown submitted a Level Two grievance complaint directly to Superintendent Conklin. He claims it was denied without explanation. Following Archer's report, on March 25, Brown emailed what he contends was a full Level Three complaint package, which included not only the alleged grading and retaliation claims, but also his new complaints about the grievance process. He sent this to every board member. Having not heard anything from any board member, Brown then emailed the school's general counsel on April 1, 2025, urging the Board to take action.

It is somewhat unclear, but it seems that Brown never received a response from the Board as to this last complaint. He now complains in this regard that (using Brown's claim numbers):

39. Principal Painter and Teacher Grubbs denied Brown due process;

40. Principal Painter and Teacher Grubbs violated Brown's First Amendment rights;

41. Principal Painter and Teacher Grubbs conspired to deny "constitutional" rights when they terminated the March meeting;

25

42. Principal Painter, Teacher Grubbs, and Splendora ISD denied Brown his grievance process rights;

43. Principal Painter and Teacher Grubbs held a fundamentally unfair conference;

44. Government records were falsified;

46. First Amendment Speech Rights were denied;

47. Brown was denied the proper grievance level by all involved;

48. Dianna Archer produced a late report with factual errors;

49. Archer, Grubbs, and Splendora ISD committed violations of its grading policy and "Failure to Provide Evidence;"

50. Teacher Grubbs and Splendora ISD failed to provide education materials during suspension;

51. Superintendent Conklin and Splendora ISD denied Brown a Level Two hearing;

52. Superintendent Conklin and Splendora ISD denied Brown his right to redress under the United States and Texas Constitutions; and

53. All concerned conspired to ignore Brown's grievance process right.

(Doc. No. 53 at 88–96).

While these complaints are lengthy, they do not state a cause of action upon which Brown can prevail. Taking the factual portions of the pleadings as accurate, Brown asked for a Level One grievance hearing, and he got one. When the hearing was terminated because of the accusations he raised, Brown sought a continuation of the Level One investigation. He got that. Archer investigated the matter thoroughly, but Brown did not like the result or its timeliness. Brown's remedy for either complaint was to appeal it to Level Two. (Doc. No. 55-3 at 6). Brown claims he did, but it is apparent the so-called Level Two approach made to Principal Conklin was actually

prior to the Level One hearing. Conklin's reply email, which Brown interprets as a denial, is dated March 3, 2025—the day before the Level One hearing. Thus, there was no denial of a Level Two hearing; in fact, Conklin's email instructs Brown as to how to pursue the grievance procedure. (Doc. No. 55 at 4).

Regardless, when one considers the combination of the March 4 hearing involving Brown, Painter, and Grubbs, and the subsequent Archer investigation, Brown was clearly provided with a review. As can be seen by the documents attached to the complaint and the motions to dismiss, Brown eventually tried to bypass a Level Two conference and go straight to a Level Three. The documents demonstrate that this was done by Brown on April 25, 2025. He labels this complaint as a Level Three complaint. What is clear, regardless of the various complaints and somehow improbable dates, is that between Archer's investigation and the hearing provided by Principal Painter, Brown was given a forum to voice his complaints. This complies with the requirements of due process and the opportunity to redress grievances—at least as far as that applies to these circumstances. *See Brewer ex rel. Dreyfus*, 779 F.2d at 263 ("Although schools may wish to provide appellate mechanisms . . . . Due process need only be provided once.").

That being the case, the Court **DISMISSES** Claims 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53, and 56.

### H. *Monell* Claims

Brown makes many conclusory contentions that certain acts or omissions are Board policies that give rise to *Monell* liability. As previously stated, a school district cannot be held liable under § 1983 under a theory of vicarious liability or *respondeat superior*. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997). Instead, to hold a government

entity liable, one must allege and prove the action taken was in accordance with that entity's policy or established custom. *Id.*

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

Given the wording of his Amended Complaint, Plaintiff clearly understands this concept. Nevertheless, in order to allege a policy or custom, it takes more than a conclusory statement that some perceived wrong is an entrenched custom; it takes specific factual allegations setting out that contention. *See Spiller v. City of Texas City, Police Dep't*, 130 F.3d 162, 167 (5th Cir. 1997). In the case of a school district, it takes facts setting out that the authority-making body—the school board—has either promulgated the policy or otherwise established the custom. *See Jett v. Dallas Indep. Sch. Dist.*, 7 F.3d 1241, 1244–45 (5th Cir. 1993). Plaintiff has not pleaded any non-speculative, non-conclusory facts that establish that the Splendora ISD school board has either adopted a policy or that its actions effectively established a practice that is "permanent and well settled and deeply embedded . . . ." *Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir. 1984) (internal quotations omitted). The fact that RB—or even both RB and TB—were treated in a certain fashion does not demonstrate such a policy—even where such allegations are accompanied by speculation that others are treated likewise.

For this reason, as well as those discussed above, Plaintiff's *Monell*-based claims, including but not limited to, Claims 28 and 33 are **DISMISSED**. Any claims which directly mention *Monell* as well as the other claims that implicate *Monell*-type allegations are **DISMISSED**.

28

## IV. Official Capacity and Qualified Immunity

As noted above, the individual Defendants have filed a motion to dismiss relying on two different theories. First, for being sued in their official capacity, they contend that the claims are duplicative of the claims against their employer, Splendora ISD, and therefore, they are entitled to be dismissed. Second, they claim they are entitled to qualified immunity. Plaintiff, in response to the initial contention, argues that since he also seeks injunctive relief against the individual Defendants, they cannot be dismissed. Further, he claims that the allegations all invoke ministerial acts and therefore clearly trigger due process claims. Finally, he argues that it is premature to consider this issue at the motion to dismiss stage because discovery is needed to ferret out secret policies. With respect to the qualified immunity claims, Plaintiff sets out what he considers to be general principles applying to all Defendants, and then takes them individually, emphasizing what acts or omissions each allegedly participated in. *See generally* (Doc. No. 61).

The Court elects to address the qualified immunity issue first. Initially, the Court needs to emphasize that immunity means not only immunity from liability, but also immunity from the lawsuit. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); *Carswell v. Camp*, 54 F.4th 307, 312–13 (5th Cir. 2022). This means, if possible, this Court should address the immunity issue before the individuals are forced to undergo participation in discovery proceedings and pretrial motions. Thus, allowing discovery to try to discover speculative "rogue actions and secret policies" is not appropriate.

To avoid a claim of qualified immunity, one must plead facts (not conclusions) that, if true, establish that the defendant: (1) while acting under color of law, (2) deprived the Plaintiff of a federal constitutional right. *West v. Atkins*, 487 U.S. 42, 48 (1988). With regard to the applicable

29

constitutional right prong, two elements are involved. The plaintiff must demonstrate: (1) a violation of this right; and (2) that the right was clearly established.

The Supreme Court has quite recently given a tutorial on this topic in *Zorn v. Linton*, 146 S. Ct. 926 (2026).

> Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law. A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. A right is not clearly established if existing precedent does not place the constitutional question beyond debate.

> To find that a right is clearly established, courts generally need to identify a case where an officer acting under similar circumstances was held to have violated the Constitution. The relevant precedent must define the right with a high degree of specificity, so that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Principles stated generally, such as that an officer may not use unreasonable and excessive force, do not suffice. In short, officers receive qualified immunity unless they could have read the relevant precedent beforehand and known that it proscribed their specific conduct.

*Zorn*, 146 S. Ct. at 930 (internal citations and quotations omitted).

The Plaintiff, while purporting to detail the acts and/or omissions, has not presented this Court with any case specifically addressing the alleged acts or omissions; nor has this Court found any governing precedent. The Supreme Court in *Zorn* held that setting out general principles is insufficient. In fact, it reversed the judgment of the Second Circuit because it only cited a case that generally outlawed certain conduct, instead of citing cases that addressed the specific conduct in question. *Zorn* was a use of force case, and the Supreme Court held that the "clearly established law" must be specific to the fact pattern in question. The case must be specific and reliance on any case involving different facts or spouting general principles is not enough. The Supreme Court held that without a specific case prohibiting the act complained of in the same circumstances, the government employee is entitled to the qualified immunity. *Id.*

30

Brown's Amended Complaint (and subsequent briefing) suffers from the same deficiency. The existing precedent must put the question beyond debate. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."). Plaintiff has not satisfied this burden.

The Court finds the Individual Defendants are entitled to qualified immunity and as such, all claims against them are **DISMISSED**. Since this Court is dismissing all the Individual Defendants in their entirety due to qualified immunity, there is no need to resolve the argument that they should be dismissed in their official capacity since Plaintiff has also sued Splendora ISD.

Nevertheless, while this Court has already found the Individual Defendants to have qualified immunity as to all claims, the Court elects to address the official capacity defense as well. The Individual Defendants have all been sued in their official capacities as educators, administrators, and/or board members of Splendora ISD. They claim that since Splendora ISD has also been sued, they are entitled to be dismissed. A lawsuit against individuals in their official capacity is in effect a lawsuit against the entity. *Turner v. Houma Mun. Fire & Police Civ. Serv. Bd.*, 229 F.3d 478, 484 (5th Cir. 2000). "A claim against government officials in their official capacity is a *de facto* suit against the local government entity of which the officials act as agents." *Guillot ex rel. T.A.G. v. Russell*, 59 F.4th 743, 751 (5th Cir. 2023).

When identical claims are levied against the entity and individuals acting in their official capacities, courts should dismiss the officials and allow the lawsuit to continue against just the entity. *See Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001). This doctrine also mandates the dismissal of the Individual Defendants in Claims 1, 2, 5, 6, 7, 8, 9,[9] 10, 11, 12, 13, 20, 21, 22,

---

[9] The Court notes on page 48 of Doc. No. 53 that Plaintiff has two Claim 9s. Both claims only name Splendora ISD. Consequently, all individuals are dismissed in both.

31

23, 24, 25, 26, 27, 28,[10] 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 42, 44, 45, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58.[11]

## V.   CONCLUSION

In conclusion, this Court **DISMISSES** with prejudice all claims against the Individual Defendants. It hereby **DISMISSES** with prejudice all claims against all Defendants for Claims 1– 12, 14–25, 26 (to the extent it makes a claim under § 37.009), 27–30, 34–44, 46–48, and 51–53, 56. Claim 31 is **DISMISSED** with prejudice as being totally inadequate factually. These are claims of violations of federal law or state law violations that are so factually intertwined with federal law such that this Court needed to exercise supplemental jurisdiction to resolve the issues.

The Court does not dismiss Claims 13, 26 (only to the extent it claims a violation of Board policy), 32, 45, 49, 50, 54, 55, 57, and 58 with prejudice because Defendants did not challenge these claims in their motions (except for the qualified immunity motion which this Court has granted) and consequently gave this Court no basis upon which to rule as a matter of law. Moreover, these eight claims are alleged against Splendora ISD and are solely based upon local policy and/or state law and are not so intertwined with federal claims that this Court needed to rule upon them. Consequently, the Court elects not to exercise supplemental jurisdiction on these as they apply only to Splendora ISD, since all Individual Defendants have been dismissed from this lawsuit. *See Manyweather v. Woodlawn Manor, Inc.*, 40 F.4th 237, 246 (5th Cir. 2022) (finding that district court did not abuse its discretion by remanding remaining state-law claims during the pleading stage when no discovery had taken place and trial was a distant possibility, months, if not

---

[10] Claim 28 names no individuals, but the Court includes it for purposes of thoroughness.

[11] Claims 54, 55, 56, 57, and 58 purport to sue the Splendora ISD School Board as a separate entity. A school board is not a separate entity separate and apart from the school district; hence, a claim against it is really in fact a claim against the ISD. *Jathanna v. Spring Branch Indep. Sch. Dist.*, No. CIV.A. H-12-1047, 2012 WL 6096675, at *4 (S.D. Tex. Dec. 7, 2012) (citing TEX. EDUC. CODE ANN. § 11.151(a) (West 2006)).

years away). Accordingly, the Court **DISMISSES** these eight claims as they apply to Splendora

ISD without prejudice, and they may be pursued in state court if the Plaintiff so elects.

    This case is hereby **DISMISSED**.


    It is so ordered.

    Signed on this the _____ day of April, 2026.

Andrew S. Hanen
United States District Judge

33